UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                           Case No.: 8:20-cr-25-CEH-SPF

MICHLER GABRIEL
_____/

**REPORT AND RECOMMENDATION**

Before the Court is Defendant Michler Gabriel's Motion to Suppress Evidence Seized Following a Warrantless Search (Doc. 23) and Motion to Suppress September 26, 2019 Post-Arrest Statements (Doc. 24). The United States filed responses in opposition (Docs. 30, 31). The Court held an evidentiary hearing on June 23, 2021. For the reasons that follow, it is recommended that both motions be denied.

**FINDINGS OF FACTS**

On the early morning of September 26, 2019, Tampa Police Officer Kevin Laren was on patrol when he pulled through the parking lot of a Citco gas station. (Tr. at 25:9-14).[1] According to Officer Laren, there were probably "two or three stolen vehicles in a few months in that parking lot alone." (Tr. 25:18-20). Officer Laren conducted routine registration checks on the vehicles parked at the gas station. (Tr. 9:15-19). One of those vehicles, a blue Honda Accord parked near a gas pump, was registered to Kristen Kosits. (Tr. 9:23-10:24). When Officer Laren reviewed the

---

[1] All references to "Tr." refer to the transcript of the evidentiary hearing held on June 23, 2021 (Doc. 61).

history of the vehicle in the RMS database, it revealed that Gabriel had been cited for driving the vehicle with a suspended license with knowledge on June 28, 2019. (Tr. 28:1-13). Officer Laren identified Kosits sitting in the passenger seat of the vehicle and Gabriel outside the vehicle pumping gas. (Tr. 10:1-10; 27:10-23). After Officer Laren exited the parking lot of the gas station, he positioned himself across the street. (Tr. 33:16-24). Officer Laren observed Gabriel get into the driver's side of the vehicle and pull out of the gas station parking lot. (Tr. 10:11-14).

*Traffic Stop*

After Officer Laren confirmed that Gabriel's license was still suspended, he initiated a traffic stop on 40th Street. (Tr. 10:15-25). The traffic stop occurred on a four-lane road consisting of two lanes running north and two lanes running south, separated by a median. (Tr. 12:10-13). Gabriel stopped the vehicle in the left northbound lane. (Tr. 12:12-14). As Officer Laren described the location of the vehicle: "it wasn't pulled over to the side of the road or anything. It was just in the middle of the road." (Tr. 12:15-16). Shortly after Gabriel stopped the vehicle, Officer Theodore Burnley arrived as back-up.[2] (Tr. 12:17-13:2).

Officer Laren approached on the driver's side, identified himself, and asked Gabriel for his license, registration, and proof of insurance. (Tr. 13:3-6). Gabriel provided Officer Laren with a Florida identification card. (Tr. 13:11-15). Meanwhile,

---

[2] Officer Laren and Officer Burnley had slightly different recollections as to when Officer Burnley first learned that Officer Laren was going to initiate a traffic stop. The Court finds the minor discrepancy to be immaterial and likely caused by the passage of time.

2

Officer Burnley approached the passenger side of the vehicle. (Tr. 13:9-10). Kosits identified herself as the registered owner of the vehicle and stated that Gabriel was driving because she was too drunk to drive. (Tr. 14:1-5). Officer Laren returned to his police car and confirmed that Gabriel's license was still suspended and that he had five previous convictions for driving with a suspended license. (Tr. 14:6-9). Officer Laren returned to the driver-side door and asked Gabriel to step out. (Tr. 14:10-12). Gabriel was placed in handcuffs and put in the backseat of Officer Laren's patrol car. (Tr. 14:10-12; 14:20-22).

*Kosits' Intoxication*

Kosits told Officer Burnley that she was not driving because she was intoxicated. (Tr. 57:8-11). Officer Burnley could tell from his initial assessment of Kosits that she was intoxicated due to her slurred speech and bloodshot and watery eyes. (Tr. 58:5-12). Officer Burnley also detected an odor of alcoholic beverage on her breath. (Tr. 58:17-20).

After Gabriel was placed under arrest, Officer Burnley asked Kosits to step out of the car and to sit by the curb because he believed Kosits was intoxicated and did not want her to drive. (Tr. 58:23-59:2; 66:23-25; 67:24-68:1). As she exited the vehicle, Officer Laren noticed that Kosits was "kind of stumbling on her feet." (Tr. 14:23-15:1). Likewise, Officer Burnley observed Kosits "stumbling towards the curb." (Tr. 60:2-5). As Kosits was sitting on the median, Officer Laren noticed that she had bloodshot and glassy eyes, that her speech was slurred, and the "odor of alcoholic

3

beverage coming from her breath." (Tr. 15:19-23; 16:5-7). Kosits then told Officer Laren that she was intoxicated. (Tr. 19-24).

At the evidentiary hearing, Kosits explained that she was not driving at the time: "Because I was intoxicated, highly intoxicated. I could not drive." (Tr. 89:19-24). Kosits had a hard time remembering whether Gabriel had gotten out and pumped gas because "everything is really blurry quite honestly." (Tr. 89:16-18). Kosits conceded that she only recalled "bits and pieces" of the traffic stop. (Tr. 82:8-10). In fact, she admitted that she did not "remember much quite honestly" as she was "very intoxicated." (Tr. 87:7-10). Kosits testified that she had consumed "a significant amount of alcohol as well as [she] had taken some ecstasy pills, so [she] wasn't exactly in [her] right mind." (Tr. 86:6-14). Kosits further admitted that she could not remember the order of events that night. (Tr. 88:4).

During her testimony, the Court observed that Kosits had difficulty focusing and maintaining eye contact. At times, Kosits paused for an abnormal amount of time, shifted around in her seat, and gazed around the courtroom before answering a question. The Court finds Kosits' testimony and recollection of the events to be incomplete and unreliable.

*Decision to Impound Vehicle*

After Officer Laren determined that Kosits was unable to drive, he gave her an opportunity to have someone pick up the vehicle. (Tr. 16:10-13). Gabriel's sister lived approximately three minutes from where the arrest occurred, and his mother lived approximately ten minutes away. (Tr. 98:14-99:6). Despite the close proximity to

4

Gabriel's family, Kosits responded that she would not be able to find someone to take the vehicle because it was 2:00 a.m.[3] (Tr. 16:14-16; 48:10-16). Moreover, Kosits did not have anyone "on scene" to move her vehicle.[4] While Officer Burnley overheard Officer Laren giving Kosits an opportunity to call someone to move her vehicle, he did not hear her response. (Tr. 68:20-69:1; 69:18-20). Kosits does not know whether she specifically asked for the opportunity to have someone come get her vehicle. (Tr. 96:10-13).

As a result, Officer Laren and Office Burnley decided to impound the Kosits' vehicle. (Tr. 16:17-19). As Officer Laren explained, the vehicle was impounded because:

> At that time because the driver [Gabriel] was already under arrest. The passenger [Kosits] was too intoxicated to drive. She even admitted that she was too intoxicated to drive. We couldn't find anybody else to take the vehicle, so at that time we didn't have a choice. We couldn't leave the vehicle in the middle of 40th Street, so we had to call for a tow truck.

(Tr. 16:23-17:3). Officer Burnley added: "It was [Kosits'] vehicle, but due to her state, she was unable to drive. She was unable to get someone there to take the vehicle. Therefore, it had to be towed." (Tr. 60:14-17). Officer Laren feared that if they left

---

[3] Kosits disputes that she was given the opportunity to call someone to move her vehicle. (Tr. 95:20-22). The Court, however, does not find Kosits' testimony reliable. Moreover, while she suggests that could have called Gabriel's mother to move her car, his mother testified that she was driving home from work, approximately 35-minutes away, when the traffic stop occurred. (Tr. 111:8-19)

[4] Gabriel's mother later arrived at the scene to pick up Kosits sometime after 3:43 a.m. (Tr. 96:14-16; 107:16-25).

5

the vehicle parked in the travel lane, it likely would have been rear-ended by someone. (Tr. 46:14-17).

*Inventory Search*

Prior to calling a tow truck, Officer Burnley conducted a warrantless inventory search of the vehicle. (Tr. 17:7-9). Officer Burnley understood the purpose of the inventory search was to create a list of all personal property in the vehicle before it was towed. (Tr. 61:2-12). Officer Laren testified that an inventory search is conducted "just so there's no discrepancy between what was in the vehicle prior to the tow truck driver getting there and then after. People in the past have claimed that there . . . [was] money inside the vehicle and the tow truck driver took it, so that's why we do it." (Tr. 17:16-23). During the inventory search, Officer Burnley found a bag containing narcotics and a firearm under the front passenger seat. (Tr. 17:12-15; 61:17-20). As a result, a crime scene tech was called to take pictures of the firearm and narcotics. (Tr. 18:3-8).

*Post-Arrest Statement*

After the narcotics and firearm were discovered, Officer Laren went to speak with Gabriel. (Tr. 18:9-11). At that time, Gabriel was in handcuffs and sitting in the backseat of Officer Laren's vehicle. (Tr. 49:15-18). Before asking any questions, Officer Laren advised Gabriel of his *Miranda* rights. (Tr. 19:5-12). Specifically, Officer Laren advised:

> You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to consult with an attorney before you make a statement or answer any question and the right to have an attorney present during questioning. If you want an attorney but cannot afford to hire an attorney, one will be appointed to

6

represent you before and during questioning free of charge. You may use any of these rights at any time before or during questioning, and you may stop the interview at any time. Do you understand these rights? At which point he said yes. Are you willing to answer questions or make a statement without an attorney being present? He said yes. Has anyone threatened you, coerced you, or promised you anything to cause you to answer questions or make a statement? He said no.

(Tr. 19:18-20:6). Officer Laren did not have Gabriel sign the Tampa Police Department Advice of Rights card. (Tr. 20:11-12). As Officer Laren testified: "I [have] never actually had anybody sign it. I usually just carry it in my pocket. I just read it, that's all." (Tr. 20:14-15). Gabriel was also in handcuffs, which would have made it difficult for him to sign the waiver. (Tr. 20:16-17). Gabriel did not appear to Officer Laren as being off or impaired any way. (Tr. 20:7-10). Gabriel's subsequent statements were not recorded because Officer Laren was not equipped with a body camera. (Tr. 21:9-11).

*Relevant Tampa Police Department Standard Operating Procedures ("SOP")*

The SOP's relevant to the Court's analysis are as follows:

**821 SEARCH AND SEIZURES**

VII.  <u>INVENTORY SEARCHES</u>:

    A.  General Principles:

        1.  Inventory searches are a well-defined exception to the warrant requirement of the Fourth Amendment.

        2.  Inventory procedures serve to protect an owner's property while it is in the custody of the police to insure against claims or disputes over lost, stolen, or vandalized property, and to protect the police from potential danger.

7

    3.    If contraband or the fruits or instrumentalities of a crime are discovered within the vehicle, pursuant to a valid inventory search, they are subject to valid seizure and are admissible as evidence.

    4.    Before a vehicle can be inventoried, it must be necessary to impound it.

  B.    Impoundment of Vehicles: A vehicle may **not** be impounded when the owner/driver requests and has the ability to have his car removed by someone else without intervention by police, or the vehicle at the time of the arrest is **not** a traffic hazard and the owner consents to leave it where it is.

  C.    Scope of Inventory Search:

    1.    The scope of the search is limited to what standard operating procedure for inventory searches permits for inventory searches.

    2.    Simply search all areas which standard operating procedure mandates be searched.

    3.    The scope of the search is not discretionary with the officer. All areas of the vehicle, including closed containers, locked glove compartment, and trunk, must be searched.

Defendant's Exhibit D (Doc. 59-64) (emphasis in original).

### 322 UTILIZATION OF WRECKERS AND IMPOUNDMENT OF VEHICLES

III.    <u>VEHICLE IMPOUND POLICY</u>: Officers are frequently faced with the responsibility of protecting privately owned vehicles and the contents thereof in a variety of contexts including traffic accidents, recovered stolen vehicles, driver arrests, vehicles seized as evidence, etc. Proper disposition depends on the nature of the law enforcement interest in the vehicle and the circumstances of each individual situation.

Absent compelling exigent circumstances, officers are **not** authorized to operate private vehicles and **not** authorized to leave private vehicles on private property without express permission of the property owner. Also, officers are responsible for taking reasonable precautions to protect vehicles and the contents thereof from damage or theft when the

8

vehicle owner is unable to do so for any reason. Accordingly, impoundment of such vehicles will most often be the most prudent and expedient option. Vehicles will generally be *rotation impounded* when there exists **no** continuing law enforcement interest in the vehicle. When there is a continuing law enforcement interest in the vehicle, it will generally be *police impounded*.

A. Except for emergency, public safety or tactical purposes when waiting for a tow truck would be impractical, officers will not drive privately owned vehicles while on duty.

B. Officers will not authorize or facilitate the parking of vehicles on private property without the express consent of the owner or manager of the property **and** the written consent of the vehicle owner.

C. In DUI arrest cases and in all cases where the mental capacity of the vehicle owner is questionable due to alcohol or drug consumption or any other reason, the owner will be presumed to be incapable of making a legally competent decision concerning the disposition of the vehicle and **all** such vehicles will be impounded.

D. Whenever a vehicle driver is arrested or otherwise incapacitated, if there is no reason for continuing law enforcement interest in the vehicle and the vehicle is otherwise fully in compliance with Florida Law, with the competent consent of the owner, the vehicle may be released to a licensed and legal driver who is **on scene**. Officers will not call or await the arrival of remote persons as an alternative to impounding the vehicle.

E. Vehicles may be secured with the owner's written consent if located on or adjacent to the owner's property or if parked in a publicly owned parking garage or marked parking space. Vehicles will not be left in the right-of-way.

. . . .

> V. <u>GENERAL</u>:
>
> . . . .
>
> B. Impounded Vehicles:
>
> 1. Officers will complete the Digital Impounded Vehicle Report in its entirety, including a complete inventory of the vehicle and a description of any damages at the time of impoundment for either police or rotation impounds.
>
>    a. A complete inventory means the thorough examination of everything in the vehicle including the contents of closed containers. The purpose of the inventory is to locate valuables that should be accounted for, or weapons and/or other contraband that may pose a threat to the impounding officers or other persons when the car is released. During the inventory process only items of value exceeding $10.00 need to be listed on the impound report.

Government's Exhibit 4 (Doc. 60-4) (emphasis in original) (footnote omitted).

## ANALYSIS

Gabriel alleges that the "warrantless September 26, 2019 search of the Honda Accord was unlawful and violated [his] Fourth Amendment right to privacy protected under the United States Constitution." (Doc. 23 at 7). Therefore, he seeks an order suppressing from admission at trial any evidence seized from the Honda Accord driven by him on September 26, 2019, including but not limited to a Sig Saucer, P938 semi-automatic handgun with serial number 52E0326206. (Doc. 23 at 1). In addition, Gabriel seeks an order "suppressing all custodial statements made by the defendant in the presence of law enforcement authorities immediately following his September 26, 2019 arrest." (Doc. 24 at 1).

10

I.      **Warrantless Search**

Gabriel contends that the warrantless search of Kosits' vehicle violated the Fourth Amendment to the United States Constitution. "The Fourth Amendment prohibits only *unreasonable* searches." *Grady v. North Carolina*, 575 U.S. 306, 310 (2015) (emphasis in original). While police officers generally need a warrant to conduct a search, the "Fourth Amendment does not require that every search be made pursuant to a warrant." *S. Dakota v. Opperman*, 428 U.S. 364, 372 (1976) (quotation omitted). Inventory searches, for example, are "a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987) (citing *Opperman*, 428 U.S. at 367-76). Police officers do not need a warrant to conduct an inventory search of an impounded car if they (1) had the authority to impound the car, and (2) followed department procedures governing inventory searches. *United States v. Isaac*, 987 F.3d 980, 988 (11th Cir. 2021). In order to utilize this exception to the warrant requirement, the government has the burden to show it met this standard. *United States v. Williams*, 936 F.2d 1243, 1248 (11th Cir. 1991).

**A. Officers had Authority to Impound Kosits' Vehicle**

As a general matter, an officer may impound a vehicle when it jeopardizes public safety or impedes the efficient movement of vehicular traffic. *See Opperman*, 428 U.S. at 369. The officer's "decision to impound is made in good faith, based upon standard criteria, and not solely based upon suspicion of evidence of criminal activity." *Isaac*, 987 F.3d at 988-89 (quotation omitted). Pursuant to the SOP: "A vehicle may **not** be impounded when the owner/driver requests and has the ability to have his car

11

removed by someone else without intervention by police, or the vehicle at the time of the arrest is **not** a traffic hazard and the owner consents to leave it where it is." (SOP 821 VII.B.) (Doc. 59-64) (emphasis in original). "[O]fficers are responsible for taking reasonable precautions to protect vehicles and the contents thereof from damage or theft when the vehicle owner is unable to do so for any reason. Accordingly, impoundment of such vehicles will most often be the most prudent and expedient option." (SOP 322 III) (Doc. 60-4).

At the time the officers decided to impound Kosits' vehicle, it clearly posed a traffic hazard. Kosits' vehicle was parked in the left northbound lane of 40th Street. As Officer Laren described it, the vehicle "wasn't pulled over to the side of the road or anything. It was just in the middle of the road." (Tr. 12:15-16). Officer Laren was credibly concerned that the vehicle would be rear-ended if left in the middle of the road. Moreover, the SOP mandates that "[v]ehicles will not be left in the right-of-way." (SOP 322 at III.E) (Doc. 60-4). The driver, Gabriel, could not move the vehicle because he was under arrest and did not possess a valid driver license. Kosits also could not move the vehicle because as she put it: "I was intoxicated, highly intoxicated. I could not drive." (Tr. 89:19-24).

The analysis then turns to whether Kosits both "request[ed] and ha[d] the ability to have [her] car removed by someone else without intervention by police."[5] Defendant's Exhibit D (Doc. 59-64). Kosits could not recall whether she specifically

---

[5] In addition, the SOP generally prohibits officers from operating private vehicles. *See* Government's Exhibit 4 (Doc. 60-4).

12

requested the opportunity to have someone come get her vehicle. Moreover, the Court finds credible Officer Laren's testimony that he asked Kosits whether she could find someone to remove her car. While Kosits did not remember anyone asking her to find someone to move her vehicle, her memory is not reliable. By her own admission, Kosits was "very intoxicated" having consumed "a significant amount of alcohol" and some ecstasy. (Tr. 86:9-14). As Kosits testified, "everything [wa]s really blurry quite honestly," she could only remember "bits and pieces," did not "remember much quite honestly" and "honestly [did not] remember the order of events." (Tr. 82:10; 87:9-10; 88:4-6; 89:17-18). Given her intoxicated state, Kosits may not have appreciated the consequences of her telling Officer Laren that she would not be able to find someone to take the vehicle because it was 2:00 a.m.[6]

Nevertheless, even if Kosits had not been given the opportunity to find someone to move her vehicle, the officers were still authorized to impound it. Under the applicable SOP, where, as here, "the mental capacity of the vehicle owner is questionable due to alcohol or drug consumption or any other reason, the owner will be presumed to be incapable of making a legally competent decision concerning the disposition of the vehicle and **all** such vehicles will be impounded." (SOP 322 III.C)

---

[6] While the Court specifically finds that Kosits did not request to have someone move her vehicle, even if she had, there was no one "on scene" available to do it. Under the SOP, the officers still would have had the authority to impound Kosits' vehicle. As the Eleventh Circuit noted in a similar circumstance, "it would have been eminently reasonable for the police to believe that public safety and prudence demanded that they not wait for somebody to come retrieve the car." *See United States v. Moss*, 748 F. App'x 257, 260 (11th. Cir. 2000).

(Doc. 60-4) (emphasis in original).  Accordingly, because Kosits was "highly intoxicated," she did not have the ability to have her car removed by someone.  The officers had the authority to impound Kosits' vehicle.

### B. Officers Acted in Good Faith

Gabriel asserts that the officers were not operating in good faith when they impounded Kosits vehicle because Officer Laren could have initiated the traffic stop while Kosits' vehicle was parked at the gas station.  Gabriel's counsel suggests that had Officer Laren initiated the traffic stop at the gas station, the officers would not have had authority to impound the vehicle and conduct an inventory search because the gas station is a public place open 24 hours a day.  Therefore, Gabriel contends, the officers acted in bad faith by waiting until Gabriel drove away from the public place before initiating the traffic stop.

The Court rejects Gabriel's theory for a litany of reasons.  As previously discussed, the officers could not have impounded Kosits' car, regardless of where it was parked, if she had the ability to move her car. At the time Officer Laren observed Gabriel at the gas station, Officer Laren identified Kosits as sitting in the passenger seat of the vehicle.  There is no evidence to suggest that Officer Laren knew at that time, or even suspected, that Kosits was intoxicated or otherwise unable operate her vehicle.  Therefore, Officer Laren had no reason to believe that initiating the traffic stop on a public road, as opposed to at the gas station, would result in Kosits' vehicle being impounded and searched.

Moreover, the Citco gas station is private property- not a public parking lot. Pursuant to SOP 322, the officers were "**not** authorized to leave private vehicles on private property without express permission of the property owner." (SOP 322 III) (Doc. 60-4) (emphasis in original). While the public is generally permitted enter the Citgo gas station as business invitees, that does not constitute *express* permission to leave an unattended vehicle parked on its property. Further, there is no evidence to suggested that Officer Laren initiated the traffic stop on a public road because he believed the property owner or manager would authorize Kosits to leave her car at the Citco gas station.

Finally, the Court finds credible Officer Laren's testimony as to his good faith reason for waiting to initiate the traffic stop. At the time Officer Laren was pulling through the gas station, Gabriel was not inside the vehicle—he was out of the vehicle pumping gas. By the time Gabriel sat in the driver's seat, thus having actual physical control of the vehicle, Officer Laren was parked across the street on the other side of a median. Therefore, it was reasonable for Officer Laren to wait for Gabriel to drive past him before initiating the traffic stop.

### C. Officers Complied with Procedures Governing Inventory Searches

When a vehicle is impounded, the SOP requires officers to conduct a complete inventory search of the vehicle. "A complete inventory means the thorough examination of everything in the vehicle including the contents of closed containers." (SOP 322 V.B.1.a) (Doc. 60-4). Moreover, the "purpose of the inventory is to locate valuables that should be accounted for, or weapons and/or other contraband that may

15

pose a threat to the impounding officers or other persons when the car is released." (Id.). The SOP emphasis that the "scope of the search is not discretionary with the officer. All areas of the vehicle, including closed containers, locked glove compartment, and trunk, must be searched." (SOP 821 VII.C.3) (Doc. 59-64).

The Court finds that Officer Burnley complied with the applicable SOPs when he conducted an inventory search of Kosits' vehicle after the officers determined that her vehicle needed to be impounded. During this lawful inventory search, Officer Burnley found a firearm under the front passenger seat as well as narcotics. Accordingly, the Court finds that the warrantless search of Kosits' vehicle did not violate the Fourth Amendment to the United States Constitution.

## II.   Post-Arrest Statements

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. *Miranda* established that statements made during a custodial interrogation are not admissible at trial unless the defendant was first advised of his rights, including the right against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). An individual is considered to be "in custody" for *Miranda* purposes where there is a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (quotation omitted). "Determining the admissibility of a post–arrest confession requires a two-part inquiry." *United States v. Bernal-Benitez*, 594 F.3d 1303, 1317–18 (11th Cir. 2010) (quoting *United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir.1994) (per curiam)). First,

16

the court must decide whether the law enforcement officers complied with the requirements of *Miranda*. *Id.* at 1318. If so, the court must next determine whether the confession was voluntary. *Id.*

At the time Officer Laren questioned Gabriel regarding the firearm and drugs found in Kosits' vehicle, Gabriel was unquestionably in custody. Gabriel was under formal arrest, handcuffed and secured in Officer Laren's police vehicle. Therefore, the Court must first determine whether Officer Laren complied with the requirements of *Miranda*. He did. Specifically, the Court finds credible Officer Laren's testimony that he read the Tampa Police Department Advice of Rights card to Gabriel verbatim. The Court further finds that this reading of Gabriel's rights satisfied the requirements of *Miranda*.

While Officer Laren did not ask Gabriel to sign the Tampa Police Department Advice of Rights card, there was no requirement that he do so. As the Eleventh Circuit has instructed, "failing to obtain a signed Miranda waiver alone is not proof that the defendant did not freely and intelligently waive his rights. Rather, the Miranda waiver form is but one of the pieces of evidence the court considers in determining whether the Government has proved by a preponderance of the evidence that the defendant voluntarily waived his rights." *Bernal-Benitez*, 594 F.3d at 1319. Moreover, the Court finds entirely credible Officer Laren's reason for not obtaining a written waiver, *i.e.*, it was not his practice to do so, and Gabriel was in handcuffs in his patrol car. *See, e.g. United States v. Barton*, No. 8:14-CR-496-T-17AEP, 2016 WL 11469177, at *4 n.4 (M.D. Fla. Mar. 3, 2016), report and recommendation adopted, No. 8:14-CR-496-T-

17

17AEP, 2016 WL 11469438 (M.D. Fla. Sept. 10, 2016) (finding credible an officer's testimony that she did not obtain the written waiver because it was her practice not to use the form when conducting an interview with an individual handcuffed in her patrol car).

After advising Gabriel of his rights, the Court credits Officer Laren's testimony that he asked Gabriel whether he understood those rights—to which Gabriel responded, yes. Gabriel then agreed to answer questions or make a statement without an attorney being present. Gabriel also confirmed to Officer Laren that no one threatened, coerced, or promised him anything to cause him to answer questions or make a statement. At the time, Gabriel did not appear to be impaired in any way. Accordingly, the Court finds that Gabriel's waiver and custodial statements were made knowingly and voluntarily.

## CONCLUSION

For the foregoing reasons, neither the search of Kosits' vehicle, nor the custodial interrogation of Gabriel violated the United States Constitution or any other law. Accordingly, it is recommended that Gabriel's Motion to Suppress Evidence Seized Following a Warrantless Search (Doc. 23) and Motion to Suppress September 26, 2019 Post-Arrest Statements (Doc. 24) be DENIED.

**REPORTED** in Tampa, Florida on September 29, 2021.

SEAN P. FLYNN
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

Within fourteen days after being served with a copy of this Report and Recommendation, any party may serve and file written objections to the proposed findings and recommendations or request an extension of time to do so. 28 U.S.C. § 636(b)(1); 11th Cir. R. 3-1. Failure of any party to timely object in accordance with the provisions of § 636(b)(1) waives that party's right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions contained in this Report and Recommendation. 11th Cir. R. 3-1.

cc:     Hon. Charlene E. Honeywell